*Fairfield,*
June, 1844.

Meade
*v.*
Smith.

## Meade *against* Smith and others.

Where it is sought to set aside a verdict, for the mistake, irregularity or misconduct of the jurors, those jurors, though willing to testify, are not competent witnesses to prove such mistake, irregularity or misconduct.

Where the jury, after the cause had been committed to them, and they had been in consultation thereon, came into court, and being called by the clerk, answered to their names; being then inquired of, whether they had agreed on a verdict, their foreman replied, that they had; but before the verdict was given to the clerk, the foreman handed to the judge a paper in these words—"In this case, the jury have agreed on a verdict, as handed in—the minority, however, desiring to have it understood, that they come in silent"—the judge read the paper, but not in the hearing of any person, and then remarked to the jury, that the verdict must be taken in, in the ordinary manner; it was then given to the clerk, was read aloud by him, and was ordered to be recorded; this being done, the jury were requested to listen to their verdict as recorded; it was read to them accordingly; and no objection was made thereto: on a motion in arrest of judgment, it was held, that these facts constituted no sufficient ground for setting aside the verdict.

It is only the final opinion of the jurors, that is to be expressed, by their verdict; and the only proper mode of giving their definitive assent to a verdict, is in open court, in answer to the usual inquiry made by the clerk.

Where the consideration of a sale of personal property by *A* to *B*, was the indebtedness of *A* to *B* for a part of the amount, and for the residue, the assumption by *B* of certain promissory notes due from *A* to *C* and others, by a parol agreement between *A* and *B*, without any communication with *C* and others, or any discharge of *A's* indebtedness to them; a bill of sale was given by *A* to *B*, in the city of *New-York*, at half past 9 o'clock *A. M.*; the property was in *Greenwich*, in this state; *B* went immediately to *Greenwich* to take possession of the property, and arrived there at about 4 o'clock *P. M.* of the same day; in the meantime, about noon, the property was attached, at the suit of *D*, another of *A's* creditors, without notice of the bill of sale, and was taken possession of, by the officer: in an action of trover brought by *B* against the officer, it was held, 1. that the consideration of the bill of sale was sufficient; 2. that being given for a lawful purpose and without actual fraud, it was not invalid or ineffectual, because the effect of it was to put the property out of the reach of *A's* creditors; nor because such an arrangement might furnish a convenient mode of defrauding the vendor's creditors; nor because *B* had not acquired actual possession of the property, before it was attached at the suit of *D*; there being no want of diligence on the part of *B* in taking such possession, and a reasonable time for that purpose not having elapsed.

It is an ancient and well established principle of the common law, that on a sale of a specific chattel, the contract between the vendor and vendee passes the property in it to the latter, without delivery.

In all the cases, in which, for the want of delivery to the vendee, or of continued possession by him, the sale has been pronounced void, it was not because the title was inchoate, but solely on the ground, that evidence of fraud, (open however to explanation,) was thereby furnished.

The evidence of fraud, in such cases, being legally rebutted, the sale is as complete and valid, against the creditors of the vendor, as against the vendor himself.

By the civil law, which, on this point, is fundamentally different from the common law, the contract of sale, although perfect and complete, had not the effect of transferring to the purchaser the property or *dominium* in the thing sold, without a delivery of it to him.

As against the owner of property, the taking of it, by an attachment against another person, is a tortious act, constituting a conversion, without demand and refusal.

Where the plaintiff in an action of trover against *S* and two others, made an ineffectual attempt to show such a connexion between *S* and the other defendants, as would affect him, by the proof adduced of a demand and refusal; and then waived such claim, and proceeded against *S* alone; after a verdict against *S*, it was held, that this was not a sufficient ground for a new trial.

*Fairfield,* June, 1844.

Meade *v.* Smith.

THIS was an action of trover for certain cows, oxen, carts and other articles of personal property, against *Ebenezer Smith, Jacob Dayton*, jr. and *David D. Husted*.

The cause was tried, on the general issue, pleaded by the defendants severally, at *Fairfield, April* adjourned term, 1844, before *Storrs*, J.

The plaintiff claimed title to the property described in the declaration, by virtue of a bill of sale thereof, made and delivered to him, in the city of *New-York*, on the 3d of *November*, 1842, at $\frac{1}{2}$ past 9 o'clock, *A. M.*, by *Esbon Husted*, of *Greenwich*, in this state. The plaintiff claimed to have proved, that the property was then in the actual possession of *Husted*, in *Greenwich;* and that he, the plaintiff, immediately on receiving the bill of sale, proceeded from the city of *New-York* to *Greenwich*, for the purpose of taking possession of the property, and arrived there at about 4 o'clock *P. M.;* that the consideration of the bill of sale consisted of the indebtedness of *Husted* to the plaintiff for about 750 dollars, and the verbal promise of the plaintiff then made to *Husted*, that he, the plaintiff, would assume upon himself the payment of a certain promissory note, which *Husted* owed to the *Mechanics and Traders Bank* in the city of *New-York*, which had not then arrived at maturity, and which was indorsed by the plaintiff, for *Husted's* accommodation; also two other notes, which *Husted* then owed to *Elizabeth Griggs*, and another which he owed to *E. Fish & Co.* It was not claimed by the plaintiff, that he had assumed the payment of these notes, by any agreement or arrangement with the cred-

itors, or that they had ever been consulted at all on the subject, or had any knowledge thereof; or that there had been any assumption of said debts, by the plaintiff, otherwise than by said verbal agreement with *Husted;* nor was it claimed by the plaintiff, that *Husted* was in any way discharged from said debts, or either of them.

The plaintiff, after having given this evidence of his title to the property in question, in order to prove a conversion thereof, by the defendants, first introduced *Caleb Husted,* as a witness, who testified, that the plaintiff, on the 3d of *November,* 1842, after his arrival at *Greenwich,* found the cows, oxen and carts, mentioned in the declaration, and them only, in the possession of the defendant *Husted,* which the plaintiff demanded of him, and he refused to deliver them to the plaintiff, and said, they had been put into his possession, by the defendant *Dayton. John Henderson,* another witness introduced by the plaintiff, testified to the same facts.

The plaintiff next introduced two writs of attachment, in favour of the *Seventh Ward Bank,* against *Esbon Husted,* with the returns of the defendant *Smith* thereon, he being the officer who served them, by which it appeared, that he, as a deputy-sheriff, attached the property in question on said writs, on the 3d of *November,* 1842, at 12 o'clock at noon of that day.

The plaintiff then introduced *Samuel Close,* as a witness, who testified, that either on the 3d of *November,* 1842, or the day following, the plaintiff demanded of the defendants *Smith* and *Dayton,* all the property mentioned in the bill of sale, which they had in their possession, but that none of such property was by them delivered to the plaintiff, to the witness's knowledge; and that he did not hear their answer in reply to the demand. *Nathaniel S. Husted,* another witness introduced by the plaintiff, testified, that the plaintiff, on the 4th of *November,* 1842, at *Greenwich,* demanded said cows, oxen and carts of the defendants *Smith* and *Dayton,* informing them, that he the plaintiff had a bill of sale of them from *Esbon Husted;* and that neither *Smith* nor *Dayton* made any reply to the demand, nor delivered the property to the plaintiff. On cross-examination by the defendants, this witness testified, that said cows, oxen and carts were in the possession of the defendant *Husted,* in whose possession they had been

put, on the 3d of *November*, 1842 ; that the defendant *Smith* had nothing to do with putting them into *Husted's* possession ; that he, the defendant *Smith*, had put them into the hands of the witness, as keeper thereof ; and that *Dayton*, who was a constable, afterwards took them, against the prohibition of the witness, from his possession, and put them into the possession of the defendant *Husted*.

It did not appear, that said cows, oxen and carts, or either of them, when the demand was made, as testified to, by this witness, were in the possession of the defendant *Smith*.

The plaintiff did not show, or claim to have shown, any connexion between the defendant *Smith* and the defendants *Dayton* and *Husted*, in relation to this property. The evidence thus introduced by the plaintiff, was, when offered, objected to, by the defendants' counsel, and was received subject to such objection.

The defendant *Smith* justified his acts, on the ground that he was, on the 3d of *November*, 1842, a deputy-sheriff ; that at noon of that day, and some hours before the plaintiff's arrival at *Greenwich*, he, as such deputy-sheriff, attached and took into his possession the property described in the declaration, as the property of *Esbon Husted*, by virtue of two writs of attachment in favour of the *Seventh Ward Bank* in the city of *New-York*, against him, brought for the recovery of debts then justly due from him to said bank ; that when the defendant *Smith* so attached and took into his possession said property, it was all in the possession of *Husted*, on his farm in *Greenwich*, the plaintiff not having then taken possession of it under his bill of sale ; and that neither he, *Smith*, nor the *Seventh Ward Bank* had then any knowledge that said bill of sale had been given ; nor was this fact, at that time, known, by any person in *Greenwich ;* nor was it known at *Greenwich*, until after the plaintiff's arrival there. This was admitted by the plaintiff.

It was agreed, that *Husted* owned all said property, at the time he gave the bill of sale to the plaintiff ; and that he had not ceased to be the owner thereof, at the time it was so attached by *Smith*, otherwise than by the giving of such bill of sale ; that *Husted* was, at this time, a bankrupt, unable to pay all his debts ; and that at the term of the superior court in *February*, 184*3*, the *Seventh Ward Bank* recovered judg-

ment in said suits against him, in one for 570 dollars, 14 cents, damages, and 88 dollars, 86 cents, costs ; in the other, for 959 dollars, 44 cents, damages, and 25 dollars, 88 cents, costs.

The plaintiff claimed to have proved, that he attempted to take possession of said property within a reasonable time after the delivery of the bill of sale, and used reasonable diligence for that purpose ; but that, before he could obtain possession thereof, it had been attached and taken away, by *Smith* ; and he insisted, that under those circumstances, he became the owner of said property, by force of the bill of sale, from the time it was delivered to him ; that he was entitled to hold said property, as against *Smith*, and the attaching creditors ; and that the mere attachment of the property by *Smith*, at the time and under the circumstances beforementioned, was in itself a conversion thereof ; and that for such conversion, without any other act done by *Smith*, or any demand on him by the plaintiff for the property, he was entitled to recover against *Smith*.

These claims were resisted, by the defendant, *Smith*, who claimed the reverse thereof. He also claimed, on the argument of the cause, that the plaintiff, by introducing the testimony of *Caleb Husted* and *John Henderson*, had elected to go against the defendant, *Husted*, and had precluded himself from recovering against the defendant *Smith ;* and that the writs and returns thereon, and the testimony of *Samuel Close* and *Nathaniel S. Husted*, as to a demand and refusal of said property, or any part thereof, should be excluded as evidence of a conversion thereof ; and that the attachment of the property by *Smith*, was not in itself a conversion thereof ; but that a demand thereof by the plaintiff, and a refusal by *Smith*, was necessary.

The plaintiff resisted these claims, and claimed the reverse thereof ; and each party requested the court to charge the jury in conformity with the claims so by him made.

The court did not charge the jury in conformity to the claims of the defendant, *Smith*, or either of them ; but did charge the jury in conformity with all the claims of the plaintiff.

The jury thereupon returned a verdict for the plaintiff,

against the defendant, *Smith;* and he thereupon moved for a new trial for a misdirection.

The defendant, *Smith,* also filed a motion in arrest of judgment, containing four specifications; in the three first of which it was stated in substance, that when the jury were in consultation upon the cause, they were unable to agree, and did not agree, upon a verdict, seven of them being in favour of the plaintiff, and five in favour of the defendants; that it was proposed and agreed among them, that a verdict should be handed in for the plaintiff, and that those who had not concurred therein, should remain silent in relation thereto; and if the court, on communication of these facts, should be of opinion and so inform the jury, that the verdict might, under such circumstances, be lawfully rendered, it should be their verdict in the cause; but if the opinion of the court should be otherwise, they should take the cause into consideration again; and that in pursuance of this arrangement, the verdict which appears on the record, was given in. To all the specifications, the plaintiff replied, that the facts therein alleged were not true, and if true, were insufficient. The court, after hearing the parties, found that the allegations in the three first specifications were not true; and as to the fourth specification, found the following facts. After the cause had been committed to the jury, and they had been in consultation in relation thereto, they came into court; the cause was called and the parties appeared; the jurors were called and answered to their names; and thereupon, before they gave in their verdict, they were asked by the clerk, if they had agreed on a verdict in the cause? to which the foreman of the jury answered, that they had so agreed; but before the verdict was handed to the clerk, the foreman handed to the judge, in relation to the cause, a paper, which he took and read, but not aloud, or in the hearing of any person. This paper contained the following writing: "In the case of *Sanford Meade* v. *Ebenezer Smith,* the jury have agreed on a verdict, as handed in: the minority, however, desiring to have it understood, that they come in silent." On reading this writing, the judge remarked to the jury, that the verdict must be taken in, in the ordinary manner. The verdict was thereupon handed, by the foreman, to the clerk, and was by him read aloud, and ordered by the judge to be re-

*Fairfield,*
June, 1844.

Meade
*v.*
Smith.

corded. It was thereupon recorded; and the jury were asked by the clerk to listen to the verdict as recorded; when it was read to the jury as recorded, and no objection was made thereto. The counsel for the defendants saw the writing handed to the judge, but did not know the contents thereof; nor was it published, or its contents in any way made known in court, to either of the parties, or their counsel, until long after the verdict was received and recorded, and the jury discharged from the cause.

On the hearing of the motion in arrest, the defendant, *Smith,* to prove the matters therein alleged, and particularly, that all the jurors before whom the cause was tried, did not agree or consent to the verdict, offered as witnesses two of such jurors, who were willing to testify in relation thereto, and appeared in court for that purpose. The plaintiff objected to their admission as witnesses; and the court excluded them; and thereupon found all the allegations relative to what took place in the jury-room, untrue, and overruled the motion in arrest.

The decisions of the court, in thus ruling out the testimony offered by the defendant, and adjudging the motion in arrest insufficient, were made additional grounds for a new trial. The whole case was reserved for the consideration and advice of this court.

*Hawley* and *Dutton,* in support of the motions, contended, 1. That *Smith's* attachment must prevail against the plaintiff's claim by virtue of the bill of sale from *E. Husted;* first, because such attachment was made before possession taken by the plaintiff, and without knowledge that the bill of sale had been given. An attachment is complete, the moment the levy is made; but a sale is inchoate, as against third persons, until possession taken. Where there are two creditors, having claims equally good, one pursuing one mode for payment or security, the other a different mode, he whose mode is *first perfected,* so as to give a perfect title or a perfect lien, will hold. 1 *Fonb.* 253. 321. 2 *Chitt. Cont.* 375. *n.* *Meeker* v. *Wilson,* 1 *Gallis.* 419. *Lamb* v. *Durant,* 12 *Mass. R.* 54. *Lanfaer* v. *Sumner,* 17 *Mass. R.* 110. *Peters* v. *Ballistier,* 3 *Pick.* 495.

Secondly, the conveyance was in itself fraudulent and void; its chief consideration being a mere verbal promise by the

plaintiff, to *Husted,* to pay certain debts of *Husted,* for which the plaintiff was not at all liable ; no engagement being made by the plaintiff to the creditors ; they having never assented to the arrangement, and having no knowledge of it. *Ayres* *Husted,* 15 *Conn. R.* 504. *Husted,* by this arrangement, was not discharged, but remained liable to those same creditors ; and in the mean time, the plaintiff was not at all liable to them. On his failure to pay, he could have been liable to no one but *Husted,* who, on recovering damages, would have put them into his own pocket. But even he could not recover, by reason of the statute of frauds. In this way, the creditors may be completely set at defiance. They cannot touch the property, as *Husted's,* for he has sold it ; nor as the plaintiff's, for he is not liable to them. *Husted* receives nothing in lieu of it, which they can touch, or with which he can pay them. They are utterly remediless. No easier or more available contrivance for defrauding creditors, could be devised. No conveyance of property, for the purpose of directly or indirectly paying debts, by the agency of him to whom it is conveyed, can be valid, where the creditors have no remedy against either the property, or the person to whom it is conveyed. The only cases in which it has been held or intimated, that a conveyance in consideration of the assumption of debts, is valid, even as between the parties, are cases where the grantee was before legally liable to the creditor for the debts ; and these were cases between the parties to the conveyance. *Treat* v. *Stanton,* 14 *Conn. R.* 445.

2. That the plaintiff having offered evidence of a conversion by the defendants, *Husted* and *Dayton,* could not afterwards abandon *that,* and go for a distinct conversion by *Smith. Forbes* v. *Marsh,* 15 *Conn. R.* 385. *The State* v. *Bates,* 10 *Conn. R.* 374. 3 *Stark. Ev.* 1440. 2 *Phil. Ev.* 143. *Pierce* v. *Pickens,* 16 *Mass. R.* 470. *Soulby* v. *Pickford,* 2 *Moo. & Pa.* 545. (17 *E. C. L.* 216.) *Stante* v. *Pricket,* 1 *Campb.* 472.

3. That the mere attachment of the property, by the defendant, *Smith,* was no conversion. Under the circumstances of the case, he could not safely, nor consistently with his duty, have forborne to attach. The property certainly had been *Husted's ;* it was in his possession, and still apparently his ; and the defendant had no means of ascertaining that it

*Fairfield,*
*June, 1844.*

*Meade*
*v.*
*Smith.*

had ceased to be his. To render the attachment a conversion, the defendant must have had notice of the transfer, and there must have been a demand upon him for the property, and a refusal by him to restore it. 2 *Saund. Pl. & Ev.* 498. *McCombie* v. *Davies,* 6 *East,* 538. *King* v. *Leith,* 2 *Term R.* 141.

4. That the witnesses were improperly rejected, on the hearing of the motion in arrest. If the fact was proper to be proved at all, it was as properly proveable, by the jurors, as by other witnesses. It is useless to establish rules for the regulation of the jury, and yet shut out what, in almost every case, is the only attainable evidence of a violation of, or departure from, those rules. No sound policy can be opposed to the ascertainment of the truth. The secrets of the jury-room, where they cover improprieties or errors, should be disclosed. The administration of justice is not kept pure, by covering up its impurities. But here the defendant imputes no misdemeanours—only an erroneous course of proceeding, with the purest intentions—and one on which they wanted information from the court. *Talmadge* v. *Northrop,* 1 *Root,* 522. *Smith* v. *Cheetham,* 3 *Caines,* 57. *Grinnell* v. *Phillips,* 1 *Mass. R.* 541. *Miles* v. *Baker,* 7 *Bac. Abr.* 13. (*Gwil.* ed.)

5. That the verdict ought to be set aside, on account of what took place in court after the jury came in. In the first place, the parties have a right to know all that passes between the court and the jury relative to the verdict. Secondly, as it appeared from the writing, that the jury had not agreed, the court should have told them, that they must *all* agree, and should have sent them out again. *Blackley* v. *Sheldon,* 7 *Johns. R.* 32. *Root* v. *Sherwood,* 6 *Johns. R.* 68. *Watts* v. *Brains, Cro. Eliz.* 779.

*Bissell* and *Ferris,* contra, contended, 1. That a good title to the property in question, was vested in the plaintiff, under his bill of sale from *Husted.* In the first place, there was a *bona fide* consideration for it. There was an unqualified undertaking on the plaintiff's part to assume and pay the debts mentioned, which, with the payment of his own debt, constituted a sufficient consideration. *Arnold* v. *Lyman,* 17 *Mass. R.* 400. *Little* v. *Little,* 13 *Pick.* 426. Secondly, the ex-

press assent of *Husted's* creditors to the assumption, was not necessary : it was to be presumed. *De Forest* v. *Bacon,* 2 *Conn. R.* 633. Thirdly, the bill of sale was not fraudulent under the act of 1828. The conveyance was not *in trust;* nor was any trust created. Fourthly, the plaintiff was not prevented from acquiring a title, because there was no delivery of the property, before it was attached by the defendant, without notice of the bill of sale. The bill of sale takes effect upon its delivery. The title then vests in the vendee—liable, however, to be divested, by his laches, so far as to let in the claims of attaching creditors. The question is one of due diligence merely. *Ingraham* v. *Wheeler,* 6 *Conn. R.* 227. *Putnam* v. *Dutch,* 8 *Mass. R.* 287. *Portland Bank* v. *Stacy,* 4 *Mass. R.* 661. *Barrow* v. *West,* 23 *Pick.* 270. It is a well settled principle regarding the sale of personal property, that the vendor's remaining in possession is not *conclusive* evidence, but only a *badge* of fraud, which may be explained. *Latimer* v. *Batson,* 4 *B. & Cres.* 652. (10 *E. C. L.* 432.) *Swift* v. *Thompson,* 9 *Conn. R.* 63. *Talcott* v. *Wilcox, Id.* 134. *Bissell* v. *Hopkins,* 3 *Cowen,* 166. 188. *Archer* v. *Hubbell,* 4 *Wend.* 514. *Sturdevant* v. *Ballard,* 9 *Johns. R.* 337. *Jennings* v. *Carter,* 2 *Wend.* 446. *Ludlow* v. *Hurd,* 19 *Johns. R.* 221. *Barney* v. *Dewey,* 13 *Johns. R.* 224. *Mowrey* v. *Walsh,* 8 *Cowen,* 238. *McCarty* v. *Vickery,* 12 *Johns. R.* 348. *Homes* v. *Crane,* 2 *Pick.* 607. This view is sustained, by all the analogies of the law ; as in the case of a symbolical delivery, in regard to the conveyance of real estate, &c.

2. That the taking by the defendant, was a conversion. In the first place, the delivery of the bill of sale, was virtually a delivery of the property. Secondly, the title was in the vendee, subject to be divested in favour of creditors, by his laches. Thirdly, it was not so divested, when the property was taken by the defendant, *Smith.* Fourthly, the possession of the defendant was, therefore, in its inception, wrongful ; and the action of trespass might well have been sustained against him. *Putnam* v. *Dutch,* 8 *Mass. R.* 287. Fifthly, where trover will lie, a demand is not necessary.

3. That the facts found by the judge under the fourth specification of the motion in arrest of judgment, furnish no ground for setting aside the verdict. The paper handed to

*Fairfield,*
*June, 1844.*

Meade
*v.*
Smith.

the judge merely informed him that the jury had agreed; and that fact had already been announced in open court. The further remark, that "the minority come in silent," merely implies, that they yielded their first impressions, and would not object to the verdict. *Nichols* v. *Bronson,* 2 *Day,* 211. *Douglass* v. *Tousey,* 2 *Wend.* 352.

4. That the testimony offered to prove the other specifications, was properly rejected. *Vaise* v. *Delaval,* 1 *Term R.* 11. *Apthorp* v. *Backus, Kirby,* 416. *Dana* v. *Roberts,* 1 *Root,* 135. *The State* v. *Freeman,* 5 *Conn. R.* 348. *Dana* v. *Tucker,* 4 *Johns. R.* 437. 1 *Sw. Dig.* 775.

Storrs, J. The defendant first claims, on the motion in arrest, that the court below ought to have admitted the testimony of the jurors in the case, in support of the allegations in said motion. This point was settled, on great deliberation, in *The State* v. *Freeman,* 5 *Conn. R.* 348. That was a capital case, where there were the strongest motives to adopt the most liberal rule which could be tolerated. But it was adopted as an universal rule, that where it is sought to set aside a verdict for the mistake or misconduct of the jurors, those jurors are not competent witnesses to prove such mistake or misconduct. The reasons which induced the court to come to that decision, are so fully stated in that case, that it is considered unnecessary here to go at large into the subject. With those reasons we are entirely satisfied. Nor do we concur in the claim made before us, that the rule applies only to cases of mere error or mistake, and not to those of irregularity and misconduct on the part of the jurors. The case which has been mentioned, was of the latter description; and there appears to us to be no sensible reason for such a discrimination, while it would be attended in practice with insuperable difficulties. In the late case of *Clum* v. *Smith,* 5 *Hills' R.* 560. the general rule which has been adopted here, was recognized, and this distinction expressly rejected.

The next question, whether the judgment should be arrested in consequence of what took place in regard to the communication made to the judge, previous to the rendering of the verdict, is not free from difficulty. If by that communication, it was intended to be understood, that some of the jurors had been induced to yield their first impressions against the

*Fairfield,*
June, 1844.
———
Meade
*v.*
Smith.

verdict, by the reasonings which had taken place in the jury-room, it would clearly constitute no objection to the verdict. It would not be strange, if there should often be a diversity of opinion among jurors, when they commence their deliberations, and that they should even continue to adhere to their first impressions with much tenaciousness, but that they should finally be brought to an unanimity of sentiment, by the mutual exchange of their reasonings and opinions; and when they are honestly convinced of their error, either by their own reflections, or the reasonings of their fellows, it is their duty to yield. The object of a consultation among jurors, is, not only to ascertain their opinions, but by affording them an opportunity of examining and discussing the case, to enable them to form their opinions; and it is not their first, but their final, conviction, that is to be expressed by their verdict.

If by the paper in question, the idea was intended to be conveyed, that although the opinions of the jurors corresponded with the verdict, it was nevertheless with such misgivings on the part of some of them, that they united in it with reluctance, we think, that this would not amount to such a dissent as should destroy its effect. It would be sufficient, that it expressed their opinions; and it would open a field for the most uncertain, not to say fanciful. speculation, if the nature or extent of any scruples which might lurk in the minds of particular jurors, could be inquired into. The object of the verdict being merely to ascertain their opinion, and that opinion being formed, it would seem to be very obvious, that its effect could not be strengthened or weakened, by the degree of confidence or distrust with which it was entertained. Inquiries on such topics would be too refined and difficult for practical purposes, and would often defeat the objects for which jury trials are intended.

But if we could see from this communication, that all of the jurors did not agree to the verdict as rendered, but that it was intended to be rendered with the concurrence of only a part of them, we have no doubt that it would not be such a verdict as would warrant a judgment upon it. The paper, however, declares, that they had all agreed on the verdict. We think, that the expression which is added, that " the minority desire to have it understood, that they come in silent," must be interpreted in connexion and consistency with that declaration;

*Fairfield,*
June, 1844.

Meade
*v.*
Smith.

and hence the expression recited must be taken to mean, that by coming in silent, whatever import was attached by them to that phrase, they did not intend to repel the idea that they had agreed on the verdict.

If it were apparent on the face of the paper in question, that its object was to obtain the advice of the judge as to the propriety of rendering a verdict without their unanimous concurrence; or if we were of opinion, that the jurors might fairly infer, that such a verdict might lawfully be rendered, we should advise, that the verdict be set aside. No such object, however, was expressed in it; nor do we think, that it is fairly to be inferred from it. On the whole, considering the indefiniteness of the writing, and the uncertainty of its object; that the verdict was, in open court, subsequently presented by the jury; and that when it was read, and they were inquired of, if it was their verdict, they agreed to it, which is the usual and only proper mode of assenting to a verdict, we are of opinion, that the judgment ought not to be arrested, on this account.

The motion for a new trial on the merits of the case, is next to be considered.

First, it is claimed by the defendant, that the conveyance of the property in question from *E. Husted* to the plaintiff, is not valid, as against the creditors of *Husted,* on account of the character of the consideration on which it was executed. That consideration consisted of a discharge by the plaintiff of a debt due to him by *Husted,* and an agreement by the plaintiff with *Husted,* that the former would pay certain creditors of *Husted* the debts which he owed to them. That the release of one's debt, or an absolute promise to pay a debt due from him to a third person, would, in ordinary cases, be a good consideration for a conveyance from such debtor to the releasor or promiser, has not been denied. Nor is it claimed, that the conveyance is not for what would ordinarily be considered a lawful purpose. That a debtor may, even on the eve of a failure, by a *bona fide* conveyance of his property to one of his creditors in payment of his debt, thus give him a preference over the others, is well settled; and we see no valid objection to such a conveyance, on an agreement that the assignee shall, in consideration of it, pay a particular creditor. Nor is it here claimed, that there was an actual fraud

in the transaction. The conveyance then being made on a good consideration,—for a lawful purpose,—and in good faith,—why should it not be sustained?

It is said, that the effect of such a conveyance is, to put the property out of the reach of *Husted's* creditors. That the effect of it is to withdraw it from his creditors generally, is true: that however is always the case, where a preference is given, by a conveyance to particular creditors of the vendor; but it was never considered objectionable for that reason. This objection would lie with greater force against a sale by an insolvent debtor on credit; for there the price of the property is to be paid to the debtor himself; and yet if the sale be honest, it was never supposed to be invalid on that account.

It is said, however, that neither the creditors of *Husted,* for the benefit of whom the conveyance was made in this case, nor his creditors generally, can avail themselves of the agreement of the plaintiff made with *Husted,* as they might, if it were a sale on credit. We are not prepared to say, that a court of equity would not lend its aid to the creditors whose debts were agreed to be paid by the plaintiff, if it became necessary. However that might be, we have been referred to no authority or principle, which would warrant us in treating a conveyance of this kind as invalid, on the ground merely of a possibility that the creditors of the assignor may not realize the avails of the property. A fund is created for the debtor, by the consideration of the conveyance; and it is to be presumed, in the absence of fraud, that his creditors will have the benefit of it. In *Ayres* v. *Husted,* 15 *Conn. R.* 504. cited by the defendant, the objection was, that there was no agreement by the assignee to pay the debt of the assignor; and on that ground, the conveyance was, to that extent, set aside. But it was there held, that if there had been such an agreement, the conveyance would be entirely valid.

It is further urged, that the arrangement in question furnishes a most convenient mode, by which a fraud on the creditors of a vendor may be perpetrated; and therefore, that it should not be sustained. It may be said of almost every species of contract for the conveyance of property, that it may be resorted to, by the wicked, as a mere cover for fraud and knavery; although it is also true, that some, from their greater plausibility, are more difficult to expose, and therefore

*Fairfield,*
June, 1844.

Meade
*v.*
Smith.

furnish more easy facilities for that purpose, than others. Still this has never been deemed a sufficient reason for setting aside, or refusing to enforce, honest agreements, which, on their face, are not unlawful ; and to do so on that ground, would not only be palpably unjust to the parties, but a most injurious restriction on the right of contract and alienation. In *Forbes* v. *Marsh*, 15 *Conn. R.* 384. and in *Calkins* v. *Lockwood*, (*ante* 276.) decided by us the present year, we had occasion to consider objections to contracts of the same character as those here urged ; but in both of those cases, which were stronger than this, they were overruled. On such a question, many of the topics which have been urged before us, would be pertinent. The situation and circumstances of the parties, the time of the conveyance, its form and mode, and in short, all the circumstances attending it, would be proper to be considered, in ascertaining the real object in view, and in determining whether the transaction was honest, or only colourable and fraudulent. But as matter of law, we cannot pronounce it void, if done in good faith, and for a purpose which the law does not condemn.

The next and most prominent question made in this case, arises from the circumstance that the plaintiff had not acquired the actual possession of the property in question, under his conveyance from *Husted*, before the attachment of it, by the defendant, *Smith ;* the defendant claiming, that, for want of such possession, he, by his attachment, obtained a prior title to the plaintiff under his assignment. The defendant having attached the property on behalf of a creditor of *Husted*, the question as to the title may be considered as one between the plaintiff and said creditor ; and both of them stand in the situation of *bona fide* purchasers. It being found by the jury, that there was no want of diligence on the part of the plaintiff, in taking possession of the property, and that a reasonable time had not elapsed for that purpose, when it was attached by the defendant, the question is, whether, as between two *bona fide* purchasers of personal property from the owner, the last, by first obtaining possession of it, acquires a preferable title over the other. We consider not only that the general principles applicable to this question are well settled, but that the very question itself has been most deliberately decided, by the courts of this state, against the claim of the de-

fendant; and, as we believe, in entire accordance with the principles of the common law. Whatever therefore we might think of the doctrines which prevail on this subject under the civil law, or other systems of jurisprudence than our own, we are not at liberty to adopt them.

It is a most ancient and well established principle of the common law, that on a sale of a specific chattel, the bargain or contract between the vendor and vendee passes the property in it to the latter, without delivery. *Glanv.* b. 10. *ch.* 14. *Clayt.* 135. *Perkins,* tit. *Grant. sect.* 92. *Noy's Max.* 87, 88. *Com. Dig.* tit. Biens. D. 3. *Shep. Touchs.* 224. *Martindale* v. *Booth,* 3 *Barn. & Ad.* 498. (23 *E. C. L.* 130.) *Dixon* v. *Yates,* 5 *Barn. & Ad.* 313. (27 *E. C. L.* 86.) *Barrett* v. *Pritchard,* 2 *Pick.* 512. *Putnam* v. *Dutch,* 8 *Mass. R.* 287. 2 *Kent's Com. lect.* 39. 2 *Steph. Com.* 120. Certain exceptions are introduced, by the statute of frauds, which, as they have no application to this case, (here being a written assignment of the property, and the contract of sale therefore not being obnoxious to any objection under that statute,) need not be noticed. Hence it follows, that the title of the purchaser is not, as is claimed by the defendant, merely inchoate and imperfect before a delivery, and that such delivery is necessary in order to perfect it, but that there is a perfect and complete transmutation of the property, by the mere agreement between the parties. It will be seen hereafter, that there is an essential difference, in this respect, between the common and civil law. No length of possession by the vendor, after the sale, will divest the vendee of the property. It may furnish evidence between them, in certain cases, of a non-acceptance by the vendee, or of an abandonment or re-transfer of the property to the vendor, or the like; but those cases have no relevancy to the present inquiry, as they stand on grounds not applicable to the case before us. There being, as to the parties, a perfect transfer of the property, and a complete transmutation of the title of it to the vendee, by the mere agreement, without a delivery, that title will be respected and prevail, as against all other persons claiming under the vendor, unless it is impeached on other grounds than the want or legal effect of such agreement.

We come now to the claim of the defendant; which is, that although, as between the parties to the sale, the property is

*Fairfield,*
June, 1844.

Meade
*v.*
Smith.

*Fairfield,*
June, 1844.
———
Meade
*v.*
Smith.

altered by the bargain, it is not altered as to subsequent *bona fide* purchasers and creditors of the vendor, unless there is a delivery of the possession, and consequently, without such delivery, remains, as to them, in the vendor.   This claim, it will be observed, proceeds on the ground, not that the want of a change of possession furnishes evidence of fraud in the sale, and that but for such fraud the property would pass to the vendee, as against such purchasers and creditors; but that, as to them, there is no transfer of the property, notwithstanding there be no fraud, by reason of such want of possession ; in other words, that as to them, before such change of possession, the title of the vendee is merely inchoate and incomplete.   It is, therefore, necessary to ascertain the precise light in which a want of change of possession is viewed, and what consequences are attached to it, in our courts.

It is obvious, that all the questions which arise on this subject, must be between the first vendee and a creditor or subsequent purchaser of the vendor ; and all of the numerous cases on this subject, were accordingly between such parties. We look in vain for any such case, in which the want of possession by the vendee, was, either by the counsel or the court, placed on the ground that such possession was necessary in order to alter the property, or that the title of the vendee was merely inchoate without it, and could be consummated only by it.   But the want of delivery to, or of the continuance of possession by, the vendee, which are placed on the same ground, is in no case considered in any other light than as furnishing evidence of fraud in the sale ; and where, for the want of such delivery or continuance of possession, the sale has been pronounced void, it was only on the ground of such fraud.   It is accordingly uniformly decided, that a retention of the possession by the vendee, either where there was no possession taken by him, or where, after a formal delivery to him, the property has gone back into the possession of the vendor, furnishes, in all cases, presumptive evidence that the sale was fraudulent, open however to explanation.   This is the plain and intelligible view of the subject taken by our courts, and is also the light in which it is considered elsewhere, where the common law prevails.   So far there is an entire uniformity in the decisions and in the elementary writers.   2 *Kent's Com. lect.* 39.   1 *Sw. Dig.* 266. & seq.

*Burge's Com. pt.* 2. *ch.* 3. 14. Lady *Arundel* v. *Phipps,* 10 *Ves. jr.* 145. *Latimer* v. *Batson,* 4 *Barn.* & *Cres.* 652. (10 *E. C. L.* 432.) *Martindale* v. *Booth,* 3 *Barn.* & *Ad.* 498. (23 *E C. L.* 130.) *Osborne* v. *Tuller,* 14 *Conn. R.* 529. *Bissell* v. *Hopkins,* 3 *Cowen,* 166. *Randall* v. *Cook,* 17 *Wend.* 53.

The language of the courts in this state, on this subject, is usually guarded and precise; and they speak of a non-delivery, or retention of possession by a vendor, only as creating a presumption of fraud, conclusive when unexplained, and never as a circumstance which renders the sale merely inchoate, either as to the vendor or a subsequent purchaser or creditor. *Patten* v. *Smith,* 4 *Conn. R.* 450. S. C. 5 *Conn. R.* 196. *Burrows* v. *Stoddard,* 3 *Conn. R.* 160. 431. *Toby* v. *Reed,* 9 *Conn. R.* 216. *Osborne* v. *Tuller,* 14 *Conn. R.* 529.

But as to what shall be considered a sufficient explanation to rebut such presumption, there has been a great contrariety of opinion; and it is here that the difficulty has existed; it being held, in some places, that it would be rebutted, by showing the good faith of the transaction, and in others, (including this state,) that the explanation must go further, and be such as the law approves. 2 *Kent's Com. lect.* 39. *Osborne* v. *Tuller,* 14 *Conn. R.* 529. and cases cited. It would be foreign from our present inquiry to enumerate all those cases in which it has been held, by our courts, that the explanation furnished by the vendee for a want of possession by him, was sufficient to rebut the presumption of fraud. Such explanation, however, has, in all of them, been deemed sufficient for that purpose, because the circumstances constituting it repel the legal inference of fraud, which would otherwise prevail; and it thus gets rid of that objection, which is the only one growing out of the want of possession. In one class of those cases, a change of possession was practicable; as, for instance, where the property was exempt from attachment or execution, or where the assignment was in trust for creditors under the act of 1828, and the trustee had furnished the security required by that act. 4 *Conn. R.* 450. 14 *Conn. R.* 529. No inference, under these circumstances, could fairly be drawn, that a fraud on the creditors of the vendor was designed. But there is another class where it was not

practicable for the purchaser to take immediate possession of the property; and that is the case now before us: in such cases, it is held, that a sufficient legal explanation of such want of possession is thereby furnished, and that it is sufficient if possession is taken in a reasonable time. In other words, the presumption of fraud is repelled, by the fact that it was not practicable for the vendee to take possession immediately, but that he did so in a reasonable time, which is considered due diligence on his part; as, for instance, in the case of a ship at sea, or other property afloat, where it is sufficient that possession of them be taken as soon as reasonably practicable after their arrival. This principle was directly established in *Ingraham* v. *Wheeler,* 6 *Conn. R.* 277. That was a case between a *bona fide* purchaser of goods on land and an attaching creditor of the vendor, who had possession of the goods as bailiff of the vendor, at the time of the attachment of them by him, but who then had no notice of the assignment, which would have constituted him the bailee of the purchaser, and be equivalent to taking possession by the latter; and the jury found, that there had been no unreasonable delay, on the part of the purchaser, in claiming the property. The court decided in favour of the purchaser. They say: "A purchaser is bound, in every instance where it is practicable, to take immediate possession of the property; and when he does not, there is a badge of fraud, open however to explanation. Where it is not practicable to take immediate possession, he is bound to do it, or that which is equivalent, in a reasonable time; he is bound to use due diligence. After the execution of the said deed of assignment, the plaintiffs were entitled to a reasonable time, either to give notice of the fact to the bailiff, or to take possession of the property. And whether they did use this diligence, or whether they were so remiss that fraud ought to be inferred, were questions of fact very properly left by the judge to the jury." This case, being in point, is decisive of this question. See also 4 *Mass. R.* 183. 535. 1 *Pet.* 449. 4 *Mass. R.* 661. 6 *Mass. R.* 422. 1 *Gallis.* 419. 8 *Mass. R.* 287. 5 *N. Hamp. R.* 570.

The case of *Lanfear* v. *Sumner,* 17 *Mass. R.* 110. has been relied on, by the defendant, and is in point in his favour. Respecting that case, it may be first remarked, that it passed under the consideration of this court in *Ingraham & al.* v.

*Wheeler*, and was pronounced not to be in accordance with the doctrine that had prevailed in this state. That case was also disapproved, in *Ricker* v. *Cross*, 5 *N. Hamp. R.* 570. In the next place, it is clearly unsupported by the case of *Caldwell* & al. v. *Ball*, 1 *T. R.* 205., which is the only common law authority relied on. By a reference to that case, it appears, that the question was as to the legal title of the property in dispute, irrespective of the fact of possession, it not being in the actual possession of either of the claimants : and the only point decided was, that where there were several bills of lading for goods, signed at different times, by the captain of a ship, which were subsequently indorsed and delivered, by the shipper, to different persons, no reference was to be had to the time when the bills of lading were signed by the captain, but that the person who first gets one of them, by a legal title, from the shipper, had a right to the property consigned ;—that an indorsement of a bill of lading, created such legal title ; and therefore, that the claimant under the one first indorsed, though last signed, should hold the property in preference to the other. That case turned merely on the operation of an indorsement of a bill of lading, which was held to constitute a transfer of the property. In the last place, all the other citations in *Lanfear* v. *Sumner*, are from the civil law ; and they undoubtedly support that case. It is however very clear, that on the subject of the sale and transfer of personal property, there is a fundamental difference between the common and civil law as to the necessity of a delivery of the thing sold. By the latter, the contract of sale, although perfect and complete, had not the effect of transferring to the purchaser the property or *dominium* in the thing sold, without a delivery of it to him. (1.) It did not effect a transmutation of the property, nor give to the purchaser the thing itself, nor a right in it, *jus in re*, but only a right to it, *jus ad rem*, that is, the right of demanding it, by action against the vendor. It was the delivery only, which operated a transfer of the *dominium*, or the right of property. Hence the property, when the sale of it was perfected, by the contract or consent of the parties, was not said to be alienated. (2.) For the purpose of compelling a delivery of it, the *actio empti* is given to the vendee. (3.) The principle that the property or *dominium* could only be transferred by delivery, and not by

contract, was steadily and rigorously adhered to, in the *Roman* law. It is the nature of contracts or obligations, says *Paul,* to bind the person, but not to operate a transfer of property. This principle was adoped in the law of *Holland,* (4.) of *Spain,* (5.) and of *Scotland;* (6.) and also in the law of *France,* before the establishment of the *Code Civil.* (7.) As a necessary consequence of that principle, it was held, where it prevailed, that the vendor may, while he retains possession, sell the thing to a second purchaser, and if this sale is followed by delivery, it gives the latter a complete and indefeasible title to the property; (8.) or the creditors of the vendor may seize the thing in the possession of the vendor, before delivery to the vendee, although the price has been paid, and the vendee, not having acquired any property or interest in the thing by his contract, cannot pursue it in his hands, but is left solely to his action for damages against the vendor. (9.) So strictly was this principle adhered to, that if the vendor died before a delivery of the thing to the purchaser, having bequeathed it as a legacy, the legatee was entitled to receive it, and the only remedy of the purchaser was an action against the heir of the vendor for the recovery of damages. (10.) By the *Code Civil,* however, the *Roman* law is so far altered, that the contract of sale has the effect of transferring to the purchaser the property in the thing sold, as between the parties to the contract, and the sale is perfected, by the consent of the parties, as evinced by that contract; although it still leaves the rights of creditors to be protected by the old rule. (11.) (1.) *Cod.* 2, 3, 20. *Dig.* 44, 7, 3. (2). *Dig.* 50, 16, 67. (3.) *Dig.* 19, 1. (4.) *Matth. de Auct.* 1, 18, 15. *Voet,* 6, 1, 20. (5.) *Gomez. Res. c.* 2. *n.* 32. *l.* 29. 30. *tit.* 5. *pt.* 5. *Feb.* 2, 4, 2, 32. (6.) *Stair. b.* 1. *tit.* 14. § 2. *Ersk. b.* 1. *tit.* 3. § 2. (7.) *Poth. Tr. de Vente. n.* 319. (8.) *Dig.* 6, 2, 9. *Cod.* 3, 32, 15. (9.) *Matth.* 1, 18, 15. (10.) *Dig.* 19, 2, 32. (11.) *Art.* 1583. 711. 1583. 2279. *Toull. liv.* 3. *t.* 3. *n.* 36.

Such is the theory of the civil law, on which the attaching creditor in this case would hold the property in question, in preference to the plaintiff. The theory of the common law has been shown to be different, and leads to the opposite result. Extreme cases have been put to show the hardship and injustice of the principle which we feel bound to recog-

nize : it is sufficient to say, that such hardship and injustice do not appear to have been hitherto experienced ; and that it is for the legislature to interpose, when the evils of the existing laws are such as to require a remedy.

The defendant next claims, that the attachment of the property in question by him, was not, under the circumstances, a conversion ; but that it was necessary for the plaintiff to prove a demand and refusal. Laying out of view the evidence introduced conducing to show a demand and refusal, it is well settled, that, as against the owner of property, the taking of it by an attachment issued against another person, is a tortious act, and therefore constitutes a conversion. Where the taking is tortious, trover and trespass are concurrent remedies, and no demand is necessary. 15 *Conn. R.* 398. 3 *Wils.* 33. 2 *Saund. Pl. & Ev.* 881. 1 *Chitt. Pl.* 154. 8 *Mass. R.* 287.

We are of opinion, that under the peculiar circumstances of this case, it was not the duty of the court below to exclude the evidence offered by the plaintiff, to prove a conversion by the defendant, *Smith.* After an ineffectual attempt to show such a connexion between him and the other original defendants as would affect him, by the demand and refusal proved, it was competent for the plaintiff to waive it, and proceed against *Smith* alone, which he did, on the first opportunity. The rule relied on by the defendant, is mainly one of practice, and in order to do perfect justice, must be applied under the discretion of the court. While, on the one hand, the plaintiff should not be allowed to vary his proof capriciously, in order to speculate on the evidence, he should not, on the other, be too strictly held, by a sudden and unexpected failure in his proof, to support the whole of his claim. Without detailing the facts on this part of the case, we think, that the ends of justice were promoted, by the course taken on the trial.

For these reasons, a new trial ought not to be granted.

In this opinion the other Judges concurred.

New trial not to be granted.